UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

| | |
|---|---|
| PENTAIR, INC., <br> a Minnesota corporation, <br><br> Plaintiff, <br><br> v. <br><br> WISCONSIN ENERGY CORPORATION, <br> a Wisconsin corporation, <br><br> Defendant. | Case No. 07-CV-3521 (PJS/RLE) <br><br> ORDER GRANTING IN PART AND DENYING IN PART DEFENDANT'S MOTION TO DISMISS |

Stuart T. Williams, Bruce C. Recher, and Wesley T. Graham, HENSON & EFRON, P.A., for plaintiff.

Richard B. Allyn and Daniel W. Berglund, ROBINS KAPLAN MILLER & CIRESI, L.L.P.; and R. Ryan Stoll, SKADDEN, ARPS, SLATE, MEAGHER & FLOM L.L.P., for defendant.

This matter is before the Court on the motion of defendant Wisconsin Energy Corporation ("WEC") to dismiss Counts I, II, and III of the complaint of plaintiff Pentair, Inc. ("Pentair").  For the reasons set forth below, the motion is granted with respect to Count I, denied with respect to Count II, and denied as moot with respect to Count III.

I.  BACKGROUND

This case arises out of a stock-purchase agreement ("Agreement"), dated February 3, 2004, between WEC and Pentair.  Pursuant to the Agreement, Pentair purchased all shares of Wicor, Inc. ("Wicor"), a WEC subsidiary.  Compl. ¶ 7.  The stock sale closed effective July 31, 2004.  Compl. ¶ 8.  The Agreement provided, and the parties agree, that Wisconsin law applies

to claims arising out of the Agreement.  Berglund Decl. Ex. A § 12.5, Sept. 7, 2007 [Docket No. 7] (hereinafter "Agreement § ___").

## A.  *Warranties*

The Agreement included a number of warranties relating to Wicor's financial health. Among other things, WEC warranted that certain of Wicor's consolidated financial statements, attached as a schedule to the Agreement, were "prepared in accordance with GAAP [i.e., Generally Accepted Accounting Principles] applied on a consistent basis . . . and fairly present in all material respects the financial position and results of operations of [Wicor], as applicable, as of the dates and for the periods indicated . . . ."  Agreement § 3.5.

WEC also provided a warranty that applied specifically to Wicor's employee benefit plans, which the Agreement referred to as "Employee Plans/Agreements."  Agreement § 3.16(a). WEC warranted that, with certain exceptions not relevant here, "all payments due from [each] Employee Plan/Agreement . . . have been made, and all amounts properly accrued to date as Liabilities that have not been paid have been properly recorded on the books of [Wicor] . . . ." Agreement § 3.16(f).

In Count I of the complaint, Pentair alleges that WEC breached the first of these warranties (§ 3.5), and, in Count II, Pentair alleges that WEC breached the second of these warranties (§ 3.16(f)).  Specifically, Pentair alleges that, in calculating Wicor's worker's compensation reserve as of December 31, 2003, WEC failed to account for incurred, but unreported, claims and associated expenses, in violation of various financial accounting standards.  Compl. ¶ 10.  Pentair alleges that this failure violated both § 3.5, under which WEC warranted that the 2003 financial statements were prepared in accordance with GAAP, and

§ 3.16(f), under which WEC warranted that all unpaid amounts accrued as liabilities with respect to employee benefit plans were properly recorded on Wicor's books.  Compl. ¶¶ 10-11.  Pentair alleges that WEC understated its worker's compensation reserve by over $6 million, and that, as a result, the price that Pentair paid for Wicor's stock was wrongly inflated by more than $6 million.  Compl. ¶ 14.

### B.  Stock Purchase Price

The Agreement established a detailed procedure for calculating the price that Pentair paid for Wicor's stock.  The Agreement began by providing that "[t]he purchase price . . . for the Shares shall be an amount equal to Eight Hundred Fifty Million Dollars ($850,000,000), as adjusted pursuant to Section 2.2(a) and Section 2.2(b), if at all."  Agreement § 2.1.  The Agreement then set out a procedure for adjusting the purchase price in light of the "Net Asset Value" of Wicor at the time of closing.  If Wicor's "Net Asset Value" was more than $659,908,536, the purchase price would be raised by the amount of the difference.  If Wicor's "Net Asset Value" was less than $659,908,536, the purchase price would be lowered by the amount of the difference.  Agreement § 2.2.

The Agreement contained a complicated process for determining the "Net Asset Value" of Wicor.  In rough outline, that process required the parties to consult with each other and with outside auditors in the creation of a series of preliminary and audited closing balance sheets.  Agreement § 2.3.  At various points in the process, each side had the right to object, and the Agreement set forth a means for resolving those objections — including, as a last resort, the use of a mutually agreed-upon accounting firm to make adjustments to the audited closing balance sheet.  Agreement § 2.3(f)(ii).  The final result of the entire process was a  "Final Closing

Balance Sheet" that, the parties agreed, would be "final, binding, conclusive and nonappealable." Agreement § 2.3(e), (f)(i)-(ii).  There is no dispute that the parties followed this process and therefore that the final closing balance sheet used to calculate the "Net Asset Value" of Wicor (and, ultimately, the purchase price of the Wicor stock) is "final, binding, conclusive and nonappealable" under § 2.3.

## II.  ANALYSIS

WEC moves to dismiss Counts I, II, and III of Pentair's complaint for "failure to state a claim upon which relief can be granted[.]"  Fed. R. Civ. P. 12(b)(6).  In reviewing a motion to dismiss under Rule 12(b)(6), a court must accept as true all factual allegations in the complaint and draw all reasonable inferences in the plaintiff's favor.  *Aten v. Scottsdale Ins. Co.*, 511 F.3d 818, 820 (8th Cir. 2008); *Maki v. Allete, Inc.*, 383 F.3d 740, 742 (8th Cir. 2004); *Mattes v. ABC Plastics, Inc.*, 323 F.3d 695, 697 (8th Cir. 2003).  The complaint may be dismissed only if "'it is clear that no relief could be granted under any set of facts that could be proved consistent with the allegations'" in the complaint.  *Aten*, 511 F.3d at 820 (quoting *Reis v. Walker*, 491 F.3d 868, 870 (8th Cir.2007)).  Ordinarily, if the parties present, and the court considers, matters outside of the pleadings, the motion must be treated as a motion for summary judgment under Fed. R. Civ. P. 56.  Fed. R. Civ. P. 12(d).  But the court may consider materials that are necessarily embraced by the complaint, as well as any exhibits attached to the complaint, without converting the motion into one for summary judgment.  *Mattes*, 323 F.3d at 697 n.4.

In response to WEC's motion to dismiss, Pentair has agreed to voluntarily dismiss Count III of its complaint without prejudice.  Pl.'s Mem. Opp. Def.'s Mot. 1 [Docket No. 9]; Fed. R. Civ. P. 41(a)(1) (plaintiff may dismiss an action before the opposing party serves either

an answer or a motion for summary judgment).  With respect to Count III, therefore, WEC's motion is denied as moot.

With respect to Counts I and II, WEC makes two arguments.  First, WEC argues that these claims are time-barred under a one-year limitation period found in the Agreement.  Second, WEC argues that these claims are, at bottom, an attack on the final closing balance sheet, and that, under § 2.3, Pentair is obligated to treat that final closing balance sheet as "final, binding, conclusive and nonappealable."  The Court considers each argument in turn.

### A. Timeliness

As WEC points out, Counts I and II are very similar.  Both counts allege a breach of a warranty by reason of WEC's alleged failure to follow GAAP with respect to Wicor's worker's compensation reserve, and both allege that Pentair suffered approximately $6 million in damages as a result.  Compl. ¶¶ 14, 24-28.  The only difference between Counts I and II is the warranty that Pentair alleges was breached.  In Count I, Pentair alleges that WEC's failure to follow GAAP with respect to worker's compensation reserves breached § 3.5 of the Agreement.  Compl. ¶ 24.  In Count II, Pentair alleges that the exact same conduct breached § 3.16(f) of the Agreement.  Compl. ¶ 27.  This difference is significant, because, under the Agreement, different limitation periods apply to these two warranties.

### 1. Count I

In general, the Agreement bars any "claim or action" for breach of warranty brought more than one year after closing:  "The representations and warranties shall survive the Closing for a period lasting until, and no claim or action shall be brought under this Article 9 for breach of a representation or warranty after the lapse of, twelve (12) months after the Closing."

Agreement § 9.4(a).  Pentair filed this action on July 26, 2007, nearly three years after the effective closing date of July 31, 2004.  Because Count I asserts a "claim or action" brought more than one year after the closing date, WEC argues, Count I is barred by the one-year limitation period of § 9.4(a).

In response, Pentair offers a creative, but ultimately unavailing, argument.  Pentair alleges that it sent WEC a letter within one year after the closing demanding that WEC indemnify Pentair for the breach of § 3.5.  Compl. ¶ 22.  This written notice, Pentair argues, was a timely "claim" within the meaning of § 9.4(a).  According to Pentair, if a party brings a "claim" within the one-year limitation period, then that party need not also bring an "action" related to that claim within the same one-year period, because the Agreement requires the timely filing of *either* a "claim" *or* an "action," but not both.  Having brought a timely "claim," Pentair argues that its related "action" did not have to be filed within the contractual one-year limitation period, but only within Wisconsin's statutory six-year limitation period for breach-of-contract actions.

Pentair's argument is refuted by the plain terms of the Agreement.  The Agreement does not state that Pentair can choose whether to bring a "claim" or an "action" within one year — or that, if Pentair brings a timely "claim," it need not bring a related "action" within one year.  Instead, § 9.4(a) of the Agreement clearly bars *any* claim that is not brought within one year and *any* action that is not brought within one year.  The Court cannot put the point any more clearly than the Agreement itself did:  "*no* claim *or* action shall be brought . . . for breach of a . . . warranty after the lapse of, twelve (12) months after the Closing."  Agreement § 9.4(a) (emphasis added).

Pentair's argument is also difficult to reconcile with another provision of the Agreement. Again, Pentair concedes that, in general, a party must bring an action within one year. But Pentair argues that, if a party files a timely claim with respect to a particular subject matter, then the one-year limitation period is "tolled" with respect to an action related to that same subject matter. The problem for Pentair is that the Agreement contains an explicit tolling provision, and it says nothing like this. Instead, the tolling provision states as follows:

> Any claim made by a Party hereunder by filing a suit or action in a court of competent jurisdiction or a court reasonably believed to be of competent jurisdiction for breach of a representation or warranty prior to the termination of the survival period for such claim shall be preserved despite the subsequent termination of such survival period.

Agreement § 9(a)(v). In other words, under the Agreement, a claim tolls the limitation period (in some respects) only when the claim is "made . . . by filing a suit or action in a court of competent jurisdiction or a court reasonably believed to be of competent jurisdiction . . . ." By implication, then, if a claim is *not* "made . . . by filing a suit or action in a court of competent jurisdiction or a court reasonably believed to be of competent jurisdiction," that claim does *not* toll the limitation period. Yet Pentair asserts that its claim — a claim that was not "made . . . by filing a suit or action in a court of competent jurisdiction or a court reasonably believed to be of competent jurisdiction . . . ." — had precisely that effect. Pentair's argument would render the Agreement's tolling provision superfluous.

In sum, Pentair's proposed reading of the Agreement conflicts with § 9.4(a) and would render superfluous § 9(a)(v), and thus, under Wisconsin law, Pentair's proposed reading must be rejected. *See Frisch v. Henrichs*, 736 N.W.2d 85, 94 (Wis. 2007) (construction of an unambiguous written contract is a question of law); *Sonday v. Dave Kohel Agency, Inc.*, 718

N.W.2d 631, 637 (Wis. 2006) (courts interpret contracts to give a reasonable meaning to each provision and to avoid rendering any portion superfluous); *Huml v. Vlazny*, 716 N.W.2d 807, 820 (Wis. 2006) (courts construe plain, unambiguous language of integrated contracts without reference to extrinsic evidence of intent). Count I of Pentair's complaint is dismissed as time-barred under § 9.4(a) of the Agreement.

### 2.  Count II

As noted, the Agreement contains a general one-year limitation period, beyond which any claim or action for a breach of warranty is prohibited. Agreement § 9.4(a). The Agreement sets forth certain exceptions to this general provision, however, including an exception for breaches of § 3.16 — the warranty on which Count II (but not Count I) is based. With respect to claims for breach of § 3.16, the Agreement provides a three-year limitation period. Agreement § 9.4(a)(iv). Pentair filed this action within the three-year period applicable to § 3.16 claims.

WEC argues, however, that Count II is not truly a claim for breach of § 3.16 — but, in substance, a claim for breach of § 3.5. Specifically, WEC argues that § 3.16 makes certain warranties only with respect to "Employee Plans/Agreements," and that a worker's compensation plan is not an "Employee Plan/Agreement" within the meaning of the Agreement. Therefore, WEC argues, its alleged failure to follow GAAP with respect to worker's compensation reserves cannot form the basis of a claim for breach of § 3.16. In WEC's view, then, Count II is governed by the general one-year limitation period applicable to breaches of § 3.5, and not by the special three-year limitation period applicable to breaches of § 3.16.

Pentair disagrees, of course, and contends that the Agreement itself defines "Employee Plans/Agreements" to include worker's compensation plans. Pentair relies on § 3.16(a), which provides:

> Schedule 3.16(a)-1 sets forth a list of all plans, programs, Contracts, policies and practices, including any pension, thrift, savings, profit sharing, retirement, bonus, incentive, health, dental, death, accident, disability, stock purchase, stock option, stock appreciation, stock bonus, executive or deferred compensation, hospitalization, "parachute," severance, vacation, sick leave, fringe or welfare benefits, any employment Contracts, "golden parachutes," *"employee benefit plans" (as defined in Section 3(3) of ERISA)*, and written or binding oral statements of policies, practices or understandings relating to employment that are sponsored or maintained by [Wicor], or to which [Wicor] contributes or is required to contribute, for the benefit of any person who currently is or formerly was employed in respect of the Water Business or who currently serves or previously served as a director in respect of the Water Business . . . .

Agreement § 3.16(a) (emphasis added). According to Pentair, Wicor's worker's compensation plans are included in this definition because they are "'employee benefit plans' (as defined in Section 3(3) of ERISA) . . . ." Compl. ¶ 15.

WEC makes two arguments in response. First, WEC argues that Wicor's worker's compensation plans are not "employee benefit plans" under the Employee Retirement Income Security Act of 1974 ("ERISA") because ERISA expressly exempts worker's compensation plans from its coverage. WEC misreads § 3.16(a) of the Agreement. That section does not provide that a plan is an "Employee Plan/Agreement" for purposes of the Agreement only if it is *governed* or *regulated* under ERISA; rather, § 3.16(a) provides that a plan is an "Employee Plan/Agreement" for purposes of the Agreement if § 3(3) of ERISA *defines* it as an "employee benefit plan."

Section 3(3) of ERISA, 29 U.S.C. § 1002(3), defines "employee benefit plan" to include an "employee welfare benefit plan . . . ."  An "employee welfare benefit plan" is, in turn, defined by ERISA as

> any plan, fund, or program which was heretofore or is hereafter established or maintained by an employer . . . to the extent that such plan, fund, or program was established or is maintained for the purpose of providing for its participants or their beneficiaries, through the purchase of insurance or otherwise, (A) medical, surgical, or hospital care or benefits, or benefits in the event of sickness, accident, disability, death or unemployment . . . .

29 U.S.C. § 1002(1).  A worker's compensation plan clearly falls within this definition.  Such a plan is a "plan . . . established or . . . maintained [by an employer] for the purpose of providing for its participants . . . through the purchase of insurance or otherwise, . . . benefits in the event of sickness, accident, disability, [or] death . . . ."

True, ERISA's substantive requirements do not apply to an employee benefit plan that is "maintained solely for the purpose of complying with applicable workmen's compensation laws . . . ."  29 U.S.C. § 1003(b)(3); *Fuller v. Skornicka*, 79 F.3d 685, 686 (7th Cir. 1996).  But that fact has nothing to do with whether a plan is defined as an "employee benefit plan" by § 3(3) of ERISA, which is all that § 3.16(a) of the Agreement requires.  Indeed, the exception contained in § 1003(b)(3) applies only to "employee benefit plan[s]," and thus the Wicor worker's compensation plans would not be exempt from regulation under ERISA unless they were first defined as "employee benefit plan[s]" by § 3(3).

WEC next argues that, by its plain terms, the warranties contained in § 3.16 apply only to the plans listed in schedule 3.16(a)-1.  Because Wicor's worker's compensation plans are not listed in schedule 3.16(a)-1, WEC contends, the warranties in § 3.16 do not apply to those plans.

-10-

In response, Pentair points out that Wicor's worker's compensation plans are disclosed on another schedule. *See* Agreement § 3.12 (stating that schedule 3.12 sets forth a list of all insurance policies, including worker's compensation insurance). Under § 12.1 of the Agreement, any item disclosed on one schedule is deemed to be disclosed on all schedules on which such item should have been disclosed.

It is possible to read § 3.16(a) as defining the list of items in schedule 3.16(a)-1 as the complete and exclusive list of "Employee Plans/Agreements" to which the warranties of § 3.16 apply. But that interpretation is not, by any means, the only reasonable interpretation of § 3.16(a). It is also possible to read § 3.16(a) — in conjunction with § 12.1 — to include both (1) a definition of "Employee Plans/Agreements" that plainly encompasses worker's compensation plans and (2) an assertion that all such "Employee Plans/Agreements" are disclosed on schedule 3.16(a)-1 — with the contents of schedule 3.16(a)-1 being deemed to include any plan disclosed on any schedule that *should* have been disclosed on schedule 3.16(a)-1.

When considering a motion to dismiss, a court must draw all reasonable inferences in the plaintiff's favor, and must not dismiss the complaint unless no set of facts could be proven that would entitle the plaintiff to relief. Thus, this Court could dismiss Count II as time-barred only if the Agreement unambiguously defined "Employee Plans/Agreements" to include only those plans listed in schedule 3.16(a)-1. As noted, however, the Agreement is, at best, ambiguous on this point. *See Gottsacker v. Monnier*, 697 N.W.2d 436, 442 (Wis. 2005) (a contract is ambiguous when its terms are reasonably susceptible to more than one construction). WEC's

motion to dismiss is therefore denied with respect to the question whether Count II is time-barred under the Agreement.

*B.  Purchase Price*

WEC also argues that Count II should be dismissed — even if it is timely — because it is an impermissible attack on the final closing balance sheet used to calculate the purchase price.[1] WEC points out that Pentair asserts in its complaint that "[w]hen WEC breached its representations and warranties regarding the preparation of its Financial Statements in accordance with GAAP by underreporting worker's compensation reserves and overstating its shareholders equity, this breach caused Pentair to pay a higher purchase price by more than $6 million." Compl. ¶ 14.  Pentair then goes on to demand recovery of more than $6 million in damages.  Compl. ¶¶ 26, 28.  As WEC reads Pentair's complaint, Pentair is alleging that there was something wrong with the purchase price — specifically, that the purchase price was inflated by over $6 million as a result of Wicor's understated worker's compensation reserve.

According to WEC, Pentair's attack on the purchase price is squarely foreclosed by §§ 2.1-2.3 of the Agreement.  Under the Agreement, if the parties followed the mechanism for adjusting the purchase price set forth in § 2.3 — which they unquestionably did — then the final closing balance sheet on which the parties based the purchase price is "final, binding, conclusive and nonappealable."  Agreement § 2.3(e), (f)(i)-(ii).  In WEC's eyes, Pentair is launching an attack on the final closing balance sheet — an attack that is foreclosed by the Agreement.

---

[1] WEC makes the same argument with respect to Count I, but Count I has already been dismissed as untimely.

The Court confesses that, at first blush, it found WEC's argument appealing. But the Court was given pause by the fact that virtually every judge who has considered a similar argument has rejected it. After reading those judges' opinions, the Court is persuaded that, despite its surface appeal, WEC's argument is mistaken. *See, e.g.*, *E*Trade Fin. Corp. v. Deutsche Bank AG*, 420 F. Supp. 2d 273, 285-86 (S.D.N.Y. 2006) (rejecting defendant's argument that the plaintiff's breach-of-warranty claims were subject to arbitration as disputes over the purchase-price adjustment procedure); *OSI Sys., Inc. v. Instrumentarium Corp.*, 892 A.2d 1086, 1095 (Del. Ch. 2006) (holding that the buyer must submit its claims to the broader form of arbitration designed for breach-of-warranty claims, rather than the narrower form applicable only to purchase-price-adjustment disputes); *Westmoreland Coal Co. v. Entech, Inc.*, 794 N.E.2d 667, 670-72 (N.Y. 2003) (rejecting plaintiff's argument that the parties' dispute over an adjustment to the purchase price was subject to alternative dispute resolution under the purchase-price adjustment provision).

The problem with WEC's argument is that it proves too much. Just about *any* claim that Pentair might make against WEC — certainly just about any claim for misrepresentation or breach of warranty — could be characterized as an attack on the purchase price, and thus as an attack on the final closing balance sheet. A claim for breach of warranty, for example, is necessarily a claim that the buyer did not get what it paid for. And one measure of damages for such a claim is the difference between what the buyer paid and what the buyer should have paid.

Clearly, though, in agreeing that the final closing balance sheet would be deemed "final, binding, conclusive and nonappealable," the parties could not have intended to immunize each other against virtually any breach-of-warranty claim. If they had, then it would have been

senseless for the parties to so carefully spell out the warranties that they were making, and even more senseless for the parties to set forth procedures (including limitation periods) for asserting claims of breach of warranty.  (After all, if no claim for breach of warranty is possible, then no limitation period on such claims is necessary.)  In short, the problem with WEC's argument is that it fails to distinguish an attack on the accuracy of the final closing balance sheet *per se* from a claim for breach of warranty.

WEC made certain warranties that are entirely separate from the purchase-price adjustment procedure.  The Agreement clearly anticipates that Pentair may take legal action to enforce those warranties.  In the course of such legal action, Pentair might pursue any of several damage theories.  For example, Pentair might argue that it was damaged to the extent that it was required to increase the understated worker's compensation reserve, or that it was damaged to the extent that the understated reserve failed to cover Wicor's worker's compensation liability.  The fact that Pentair might also argue that it was damaged to the extent of the difference between what Pentair paid (the purchase price) and what Pentair received (a company whose financial health was worse than warranted) does not convert its breach-of-warranty claim into a forbidden attack on the accuracy of the final closing balance sheet.

To be clear:  The Court is in no way implying that Pentair *was* damaged or that any of these possible measures of damages is proper.  Those questions are beyond the scope of WEC's motion.  Rather, the Court is merely explaining why Pentair's breach-of-warranty claim — no matter what measure of damages Pentair ultimately pursues — does not challenge the parties' agreed-upon purchase price or the "final, binding, conclusive and nonappealable" closing balance sheet on which that price was based.  WEC's motion to dismiss Count II of the

complaint on the basis that Count II is an impermissible attack on the closing balance sheet is therefore denied.

ORDER

Based on the foregoing, and on all of the files, records, and proceedings herein, IT IS HEREBY ORDERED that:

1. Count III is DISMISSED WITHOUT PREJUDICE pursuant to Fed. R. Civ. P. 41(a).

2. Defendant's motion to dismiss [Docket No. 3] is GRANTED with respect to Count I of plaintiff's complaint, and Count I is DISMISSED WITH PREJUDICE AND ON THE MERITS.

3. Defendant's motion is DENIED with respect to Count II and DENIED AS MOOT with respect to Count III.

Dated: March 7, 2008
s/Patrick J. Schiltz
Patrick J. Schiltz
United States District Judge